In re the MARRIAGE OF Ken KIMURA and Fumi Kimura.

Upon the Petition of Ken Kimura, Appellee,

And Concerning Fumi Kimura, Appellant.

No. 89–1729.

Supreme Court of Iowa.

June 19, 1991.

Rehearing Denied July 17, 1991.

Emil Trott, Jr., Des Moines, for appellant.

Margaret T. Lainson of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

In this dissolution of marriage proceeding the district court dissolved the marriage of two Japanese citizens. The husband lives here, on a permanent residency status. The wife lives in Japan, has never been here, and has never had any contact with this state. The wife unsuccessfully challenged the district court's jurisdiction to dissolve the marriage. The wife also unsuccessfully challenged the husband's compliance with the residency requirements for a dissolution found in Iowa Code section 598.6 (1987). Finally, the wife was not able to convince the district court to decline jurisdiction on the ground that Japan was the more convenient forum to dissolve the marriage. Because we agree with the district court on all three issues, we affirm.

I. *Background Facts and Proceedings.*

Ken and Fumi Kimura were married in Japan in 1965. Both are Japanese citizens. They have a daughter and a son. The daughter, Izumi, was twenty-three at the time of the dissolution hearing. The son, Naoki, was twenty-one. Ken and Fumi have lived apart since September 1973.

Ken graduated from Kobe University Medical School in Japan. Currently, he is a pediatric surgeon at the University of Iowa Hospitals and Clinics in Iowa City.

In July 1986 Ken was invited to come to the United States where he took a position at the Long Island Jewish Medical Center in New Hyde Park, New York. When he came to the States, Ken had an H–1 visa. Such a visa is a temporary one, issued to persons with special talents or abilities that may be useful to the United States. The prospective employer or other individual inviting the person must apply to the United States government for the visa.

In October 1986 the center filed an application on Ken's behalf for permanent residency status. Permanent residency status confers several privileges. First, the individual having such a status may live in the United States for as long as the person desires. Second, such a person is entitled to a "green card" that permits the person to obtain employment in the United States on a permanent basis. Last, four years after receiving permanent status, the person may apply for United States citizenship. Ken received permanent residency status in October 1987. He received his green card the following month.

In February 1987 Ken had been invited to the University of Iowa as a guest lecturer. While at the university, Ken met with Dr. Richard Soper, Director of Pediatric Surgery at the University of Iowa Hospitals and Clinics. They discussed possible faculty positions for Ken at the university.

Ken was interviewed at the university in July. In October he was hired as an Associate Professor of Medicine. This is a tenure-track position, but there is no guarantee of tenure. A tenure-track position calls for at least a permanent residency status.

In November, after receiving his green card, Ken moved to Iowa City where he began working at the university.

In March 1988 Ken filed a divorce mediation proceeding with the family court in Japan. In July he withdrew from the proceeding. Apparently he could not attend that court's reconciliation proceeding between himself and Fumi because of his work.

In December Ken filed a petition for dissolution of marriage in Johnson County District Court. He alleged that he had resided in Iowa for more than one year. He further alleged that his residency was not just for the purpose of obtaining a dissolution. Finally, he alleged a breakdown of the marital relationship.

Because personal service was not possible on Fumi in Iowa, a copy of the petition was mailed to her in Japan. In addition, notice of the petition was published in the Iowa City Press Citizen on December 14, December 21, and December 28.

In February 1989 Fumi filed a preanswer motion in which she contested the district court's subject matter and personal jurisdiction. She asked that the Iowa proceedings be dismissed or abated.

On April 7 Fumi amended her preanswer motion. She alleged that on March 16, 1988, she herself had filed a divorce mediation proceeding in Japan and that the Japanese court had personal and subject matter jurisdiction. She asked the district court in the alternative to stay the Iowa proceedings so that the Japanese court could hear all the issues related to the marriage.

On April 18 the district court denied Fumi's motion. The court concluded it had subject matter jurisdiction. But it also concluded it had no personal jurisdiction over Fumi. The court carefully noted that its relief had to be confined to a "determination of the marital status" of the parties. The court acknowledged it could not decide any issues requiring personal jurisdiction. Finally, the court refused to defer to the Japanese court. The court gave two reasons for its refusal. First, Ken had fulfilled all legal requirements under Iowa law to pursue the dissolution action here.

Second, Fumi made no compelling showing why the district court should defer.

The following month Fumi unsuccessfully sought an interlocutory ruling in this court on these issues. Following this she filed an answer to Ken's petition.

In her answer Fumi denied Ken was a resident of Johnson County, Iowa; denied the petition was filed in good faith; denied that Ken had resided in Iowa for more than one year; and denied his residence in Iowa was in good faith. She also alleged that the Iowa proceedings should be stayed, dismissed, or abated in favor of the pending proceeding in Japan. Finally, she asked that a conciliator in Japan be appointed pursuant to Iowa Code section 598.16. The record fails to show whether a conciliator was appointed. Such appointment is mandatory when a request for it is made in a responsive pleading. *In re Marriage of Schroeder*, 393 N.W.2d 808, 809 (Iowa 1986). However, no issue is raised here on that point.

On July 18, 1989, the parties' attorneys prepared and signed a pretrial conference report in which they stated that Fumi "continues to challenge the court's jurisdiction to determine even the marital status."

On October 10, 1989, Fumi again challenged the subject matter jurisdiction of the district court. She did so in a motion to decline subject matter jurisdiction. She urged two grounds: (1) Japan does not recognize a separation of the issues of marital status from property division; and (2) Japan is the nation that has the most significant contacts to the marital status of the parties.

Fumi supported the motion with an extensive affidavit. In it she points out that under Japanese law the "person whose improper conduct caused the marital problems is not entitled to a divorce." She suggests Ken is that person. So under Japanese law he would not be entitled to a divorce. She further suggests that if Ken prevails here he would achieve something he could not achieve in Japan. She concludes she would therefore be "effectively ... denied the protection of the laws of

[her] country, and [Ken would] achieve a result which his country would deny him."

Two days later, the matter proceeded to final hearing. Fumi did not personally appear but her attorney did. Fumi's attorney asked the court to consider her affidavit in support of her motion to decline subject matter jurisdiction.

At the hearing Ken appeared and testified as did Dr. Soper. The court heard testimony about the circumstances surrounding Ken's coming to Iowa, his residence status, the breakdown of the marriage, and his green card, which was introduced into evidence.

On the same day of the hearing the court filed its decree. The court found that there had been a breakdown of the marital relationship. The court concluded that Ken had satisfied the residency requirements of Iowa Code section 598.6. It then dissolved the marriage and assigned costs to Ken.

Fumi appealed.

II. *The Due Process Challenge.*

█ Fumi poses the issue this way: "Iowa's assertion of jurisdiction over respondent (who has no contacts with Iowa) or her marriage based solely on petitioner's alleged residence in Iowa violates the due process clauses of the United States and Iowa Constitutions."

The federal fourteenth amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. Its counterpart is found in article I, section 9 of the Iowa Constitution and is virtually the same: "[N]o person shall be deprived of life, liberty, or property, without due process of law." When state and federal constitutional provisions contain a similar guarantee, we usually deem them to be identical in scope, import, and purpose. *State v. Scott,* 409 N.W.2d 465, 467 (Iowa 1987).

Early on, due process required the personal presence of the defendant in the forum state as a condition for rendering a binding personal or in personam judgment against the defendant. *Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L.Ed. 565, 572 (1878). The rule was expanded in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Now due process does not require such personal presence. Due process only requires that the defendant have certain minimum contacts with the forum state. However, those contacts must be such "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102. Simply put, there must be a connection among the forum, the litigation, and the defendant.

The rule was otherwise with respect to actions in rem and quasi in rem. An in rem judgment affects the interests of all persons in designated property. A quasi in rem judgment affects the interests of particular persons in designated property. *Hanson v. Denckla,* 357 U.S. 235, 246 n. 13, 78 S.Ct. 1228, 1236 n. 13, 2 L.Ed.2d 1283, 1293 n. 13 (1958). In these two classes of cases, the physical presence of the defendant's property in the forum was enough to allow state courts to assert jurisdiction. *Pennoyer,* 95 U.S. at 730–31, 24 L.Ed. at 571.

This last rule was swept away in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). In *Shaffer,* the Supreme Court rejected *"Pennoyer's* premise that a proceeding 'against' the property is not a proceeding against the owner of the property." *Shaffer,* 433 U.S. at 205, 97 S.Ct. at 2580, 53 L.Ed.2d at 698. In effect, the Court equated in personam jurisdiction with in rem and quasi in rem jurisdiction. *Id.* at 212, 97 S.Ct. at 2584, 53 L.Ed.2d at 703. And the Court concluded that "all assertions of state court jurisdiction must be evaluated according to the standards set forth in International Shoe and its progeny." *Id.; accord Burnham v. Superior Court of Cal.,* 495 U.S. ——, ——, 110 S.Ct. 2105, 2116, 109 L.Ed.2d 631, 646 (1990) ("quasi in rem jurisdiction ... and in personam jurisdiction are really one and the same and must be treated alike"); *Percival v. Bankers Trust Co.,* 450 N.W.2d

860, 863 (Iowa 1990). So in those states—like Iowa—that

> extend judicial jurisdiction as far as the Constitution permits, a plaintiff who is unable to obtain personal jurisdiction over a defendant will be unable to obtain quasi in rem jurisdiction by virtue of the presence of defendant's property in the state.

Vernon, *State Court Jurisdiction: A Preliminary Inquiry Into the Impact of Shaffer v. Heitner*, 63 Iowa L.Rev. 997, 1000–01 (1978) [hereinafter *State–Court Jurisdiction*].

Fumi relies on *Shaffer* in support of her contention that jurisdiction to grant the dissolution must be tested by the minimum contacts standard of *International Shoe*. A footnote in *Shaffer* suggests her reliance is misplaced. *See Shaffer*, 433 U.S. at 208 n. 30, 97 S.Ct. at 2582 n. 30, 53 L.Ed.2d at 700 n. 30. One commentator seems to agree:

> Although the *Shaffer* Court concluded that *all* assertions of state-court jurisdiction must conform to the standards of *International Shoe* and, thus, be based upon a nexus among the forum, the litigation, and the defendant, the nexus requirement is unlikely to apply to cases in which status provides the basis of the asserted jurisdiction. The power to dissolve the marriage status in an ex parte proceeding normally is thought to stem, at least in part, from the perception of the marriage status as a *res*, and thus, as a "thing" to which the court's jurisdiction can attach. Despite the obvious analogy between in rem and quasi in rem jurisdiction based on the presence of property and ex parte-divorce jurisdiction based on the presence of a *res* (marriage status), the Court specifically noted in a footnote [n. 30] that it was not suggesting "that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness." The all-inclusive language of the *Shaffer* conclusion, therefore, may not include cases in which status is the basis of the asserted juris-

diction. As far as the *Shaffer* holding is concerned, the forum—litigation—plaintiff nexus recognized as sufficient by the Court in *Williams v. North Carolina* [, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942)] seems to remain a valid basis of jurisdiction for ex parte divorces.

*State–Court Jurisdiction*, 63 Iowa L.Rev. at 1005–06 (citations omitted).

In *Williams v. North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942) [hereinafter *Williams I*], the question was whether full faith and credit had to be given to a foreign divorce decree where only one spouse was domiciled in the foreign state and the other spouse had never been there. *Williams I*, 317 U.S. at 298–99, 63 S.Ct. at 213, 87 L.Ed. at 286. The Supreme Court held that the foreign state's high interest in the marital status of its domiciliaries required that full faith and credit be given such a decree. *Id.* The Court did require, however, that substituted service on the absent spouse meet due process standards, that is, reasonably calculated to give the absent spouse actual notice and an opportunity to be heard. *Id.*

In *Williams I* the Court had difficulty classifying dissolution proceedings. Though it did not view such proceedings as in rem actions neither did it view them as mere in personam actions. *Id.* at 297, 63 S.Ct. at 212–13, 87 L.Ed. at 285. According to the Court, domicile of one spouse within the forum state gave that state the power to dissolve the marriage regardless of where the marriage occurred. *Id.* at 298, 63 S.Ct. at 213, 87 L.Ed. at 286. This court too has deemed domicile as essential to dissolution of marriage jurisdiction. *See Cooper v. Cooper*, 217 N.W.2d 584, 586 (Iowa 1974).

The cases generally adopt the following explanation of the components for a dissolution of marriage proceeding:

> It is commonly held that an essential element of the judicial power to grant a divorce, or jurisdiction, is domicil. A court must have jurisdiction of the res, or the marriage status, in order that it may grant a divorce. The res or status follows the domicils of the spouses; and

therefore, in order that the res may be found within the state so that the courts of the state may have jurisdiction of it, one of the spouses must have a domicil within the state.

24 Am.Jur.2d *Divorce & Separation* § 238, at 336 (1983).

*Williams v. North Carolina* reached the Supreme Court a second time. The Court held that while the finding of domicile by the state that granted the decree is entitled to prima facie weight, it is not conclusive in a sister state but might be relitigated there. *Williams v. North Carolina*, 325 U.S. 226, 238–39, 65 S.Ct. 1092, 1099, 89 L.Ed. 1577, 1586 (1945) [*Williams II*].

The divisible divorce doctrine emerged in *Estin v. Estin*, 334 U.S. 541, 549, 68 S.Ct. 1213, 1218, 92 L.Ed. 1561, 1568–69 (1948). In *Estin* the Court held that Nevada in an ex parte divorce proceeding could change the marital status of those domiciled within its boundaries. The power to do so stems from Nevada's "considerable interest in preventing bigamous marriages and in protecting the offspring of marriages from being [illegitimate]." *Estin*, 334 U.S. at 546, 68 S.Ct. at 1217, 92 L.Ed. at 1567. But Nevada could not wipe out the absent spouse's claim for alimony under a New York judgment in a prior separation proceeding because Nevada had no personal jurisdiction over the absent spouse. *Id.* at 548–49, 68 S.Ct. at 1218, 92 L.Ed. at 1568. So New York did not have to give full faith and credit to that part of the Nevada decree which purported to eliminate the support obligation of its domiciliary. *Id.* at 549, 68 S.Ct. at 1218, 92 L.Ed.2d at 1568.

The divisible divorce doctrine simply recognizes the court's limited power where the court has no personal jurisdiction over the absent spouse. In these circumstances the court has jurisdiction to grant a divorce to one domiciled in the state but no jurisdiction to adjudicate the incidents of the marriage, for example, alimony and property division. In short, the divisible divorce doctrine recognizes both the in rem and in personam nature of claims usually raised in dissolution of marriage proceedings.

The Supreme Court reaffirmed *Estin* in *Vanderbilt v. Vanderbilt*, 354 U.S. 416, 417–18, 77 S.Ct. 1360, 1362, 1 L.Ed.2d 1456, 1459 (1957). *Vanderbilt* differed from *Estin* only in the fact that the absent spouse's right to alimony had not been determined before the ex parte divorce in Nevada. *Vanderbilt*, 354 U.S. at 418, 77 S.Ct. at 1362, 1 L.Ed.2d at 1459.

Without expressly saying so, we relied on the divisible divorce doctrine in *Brown v. Brown*, 269 N.W.2d 819 (Iowa 1978). In *Brown* the plaintiff obtained a divorce in Illinois after securing constructive service on the defendant. The Illinois decree purported to reserve the issues of alimony and child support. Later, after she obtained personal service on the defendant, the plaintiff sought a decree fixing alimony. Reversing prior court decisions, this court held that the right to alimony survives a sister-state dissolution decree based on jurisdiction obtained through constructive service. *Brown*, 269 N.W.2d at 820–21. From the following language it appears the court based its ruling on the divisible divorce doctrine and considerations of fairness:

> Because alimony is a personal obligation, a court which enters a decree terminating a marriage based on *in rem* jurisdiction is without power to decide the alimony issue. If the decree purports to do so it is to that extent void. Our rule denying a divorced spouse the right to claim alimony in a subsequent *in personam* proceeding thus prevents the issue from being adjudicated at all. No sound reason exists for perpetuating this rule. It is unreasonable and unfair.

*Id.* at 821 (citations omitted).

■ We conclude that the all-inclusive language of the *Shaffer* conclusion does not include dissolution of marriage proceedings. In other words, jurisdiction to grant such a dissolution is not to be tested by the minimum contacts standard of *International Shoe*.

■ We further conclude that domicile continues to be the basis for a court's jurisdiction to grant a dissolution of marriage decree. So the courts of this state have

the power to grant dissolution of marriage decrees provided the petitioner is domiciled in this state. Such power exists even though the petitioner's spouse is absent from this state, has never been here, and was constructively rather than personally served.

Two other courts have faced this issue. One court held that *Shaffer* did not change the long-standing rule of *Williams I. Carroll v. Carroll*, 88 N.C.App. 453, 453, 363 S.E.2d 872, 873 (1988). In other words, a state can still alter the marriage status of a spouse domiciled there, even though the other spouse is absent, provided the nature of the substituted service on the absent spouse comports with due process. *Id.* (citing *Shaffer*, 433 U.S. at 208 n. 30, 97 S.Ct. at 2582 n. 30, 53 L.Ed.2d at 700 n. 30); *see also Carr v. Carr*, 46 N.Y.2d 270, 273 n. 1, 385 N.E.2d 1234, 1236 n. 1, 413 N.Y.S.2d 305, 307 n. 1 (1978) (relying on footnote 30 in *Shaffer* in suggesting by way of dictum that the classical concepts of divorce jurisdiction survive *Shaffer*).

Another court used the minimum contacts analysis but with a different twist. *See In re Marriage of Rinderknecht*, 174 Ind.App. 382, 367 N.E.2d 1128 (1977). In *Rinderknecht* the court held that the dual nature of a dissolution of marriage proceeding does not become unified when a minimum contacts analysis is applied to both the in rem and in personam aspects of marriage. *Id.* 367 N.E.2d at 1134.

Because two different types of actions are involved in such a proceeding, the *Rinderknecht* court reasoned that two levels of minimum contacts may be found sufficient to meet the requirements of fair play and substantial justice. *Id.* For example, residency of one of the parties is enough to satisfy minimum contacts necessary to dissolve the marriage. But something more is required to satisfy minimum contacts necessary for in personam jurisdiction to adjudicate the incidents of the marriage. *Id.* at 1134–35. While purporting to apply the minimum contacts analysis, the court reached essentially the same conclusion it could have reached without that analysis. *Cf. In re Marriage of Hudson*, 434 N.E.2d

107, 117–19 (Ind.App.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983) (adopting the in rem status approach of *Rinderknecht* to support assertion of jurisdiction in custody proceedings); *Hudson v. Hudson*, 35 Wash.App. 822, 670 P.2d 287 (1983) (recognizing Indiana's award of custody in *In re Marriage of Hudson*, 434 N.E.2d 107 (Ind.App.1982) and adopting *Rinderknecht*'s in rem status analysis in custody dispute). *But see Pasqualone v. Pasqualone*, 63 Ohio St.2d 96, 406 N.E.2d 1121, 1126–27 (1980) (applying minimum contacts standard to custody dispute).

No claim is made that the service of process here did not meet the requirements of due process. So we are left with the question whether Ken established his domicile or residency in this state. That leads us to the next issue.

III. *Challenge to Domicile or Residency.*

■ The district court adjudicated only the marital status. And that was done based on Ken being domiciled in this state. None of the incidents of the marriage—for example, alimony and property division—were adjudicated because the court did not have personal jurisdiction over Fumi. So the district court carefully followed the rules laid down in *Williams I* and in *Estin*.

Fumi contends that even if minimum contacts were not the standard, Ken still had to establish that he met the residency requirements of this state before the court could dissolve the marriage. She argues that Ken failed to establish those requirements and so the district court should not have dissolved the marriage. For reasons we discuss, we disagree.

■ The jurisdictional issue we face was decided in a ruling on a preanswer motion. *See* Iowa R.Civ.P. 104(a) (want of jurisdiction of the subject matter may be raised by preanswer motion). This motion replaces the special appearance which is no longer in our rules of civil procedure. *See* Iowa R.Civ.P. 66 ("The special appearance is abolished. A defendant may not appear specially for the sole purpose of attacking the jurisdiction of the court."). Neverthe-

less our review is the same. Such review is not de novo; the findings of fact of the district court are binding on us if supported by substantial evidence. *In re Marriage of Vogel*, 271 N.W.2d 709, 711 (1978). Evidence is substantial if a reasonable mind could accept it as adequate to reach the same finding. *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 913 (Iowa 1987).

This matter went to final hearing. So our review of that record on the jurisdictional issue is de novo. Iowa R.App.P. 4. In equity cases we give weight to the fact findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7).

Iowa Code section 598.6 governs the power or jurisdiction of the district court to grant a dissolution of marriage. *See In re Marriage of Bouska*, 256 N.W.2d 196, 198 (Iowa 1977). It provides:

Except where the respondent is a resident of this state and is served by personal service, *the petition for dissolution of marriage,* ... must state that *the petitioner has been for the last year a resident of the state,* specifying the county in which the petitioner has resided, and the length of such residence therein after deducting all absences from the state; *and that the maintenance of the residence has been in good faith and not for the purpose of obtaining a marriage dissolution only.*

(Emphasis added.)

According to section 598.6 Ken had to establish the following: (1) he resided in Iowa for at least one year before the petition was filed; and (2) his residence here was in good faith and not just for the purpose of obtaining a marriage dissolution.

■ Residence for the purpose of section 598.6 has the same meaning as domicile. *Vogel*, 271 N.W.2d at 711. To have a residence or domicile within the meaning of this section, "one must have a fixed habitation with no intention of" leaving it. *Id.* at 711 (quoting *Korsrud v. Korsrud*, 242 Iowa 178, 182, 45 N.W.2d 848, 850 (1951)).

■ Once a domicile is established, it continues until a new one is established. A new domicile is established if all of the following things happen: (1) the former domicile is abandoned; (2) there is an actual removal to, and physical presence in the new domicile; and (3) there is a bona fide intention to change and to remain in the new domicile permanently or indefinitely. This intention must be a present and fixed intention and not dependent on some future or contingent event. *Julson v. Julson*, 255 Iowa 301, 305, 122 N.W.2d 329, 331 (1963).

In his ruling on Fumi's preanswer motion, Judge Paul J. Kilburg found that Ken had established the residency requirements of section 598.6. Judge August F. Honsell presided over the final hearing and similarly found in his decree that Ken had established these requirements. We think the record amply supports the pretrial ruling. And on our de novo review of the record made at the final hearing, we agree with Judge Honsell's findings.

We think Ken amply proved that he met the residency requirements of section 598.6. He resisted Fumi's preanswer motion and supported his resistance with his affidavit. In the affidavit he swore to a number of facts showing that he had abandoned his domicile in Japan in favor of the one here. For example, he swore that he had no other permanent residence other than his residence in Johnson County. In addition, he swore that since moving to Iowa he had obtained an Iowa driver's license and had opened bank accounts at local banks. Finally, he swore that he intends to remain here for an indefinite period so long as his employment at the university is satisfactory to him and the university.

In this affidavit Ken swore to several other facts. These facts support his claim that he did indeed establish his domicile or residence here and that the residence was in good faith and not just to obtain a dissolution of marriage. These facts include his residence in Johnson County for thirteen months before his petition was filed; his permanent resident status; his tenure track with the university, which requires a permanent resident status; his green card, which permits him to obtain permanent em-

ployment here; and his eligibility for U.S. citizenship within four years of obtaining his permanent resident status.

Ken testified to all of these facts at the final hearing. By this time Ken had resided in Johnson County a little more than two years. Dr. Soper substantially confirmed all of these facts.

■ We see nothing in the evidence to support Fumi's contention that Ken's residence here was in bad faith and *only* for the purpose of obtaining a dissolution of marriage. It may be that *one* reason Ken came here was—as Fumi suggests—because of our liberal dissolution marriage law as compared to Japan's. But that fact is not sufficient to preclude Ken from establishing a domicile or residence in Iowa, especially in light of his intention to remain here indefinitely. *See Cooper v. Cooper*, 217 N.W.2d 584, 587 (Iowa 1974).

■ Nor does Ken's continued Japanese citizenship preclude such a domicile or residence. A foreign citizenship does not—standing alone—bar one from establishing a domicile or residence for dissolution of marriage purposes. *Nicolas v. Nicolas*, 444 So.2d 1118, 1120 (Fla.Dist.Ct.App.1984). *See generally* Annotation, *What Constitutes Residence or Domicil Within State by Citizen of Another Country for Purpose of Jurisdiction in Divorce*, 51 A.L.R.3d 223 (1973). Simply put, it is legal residence, not citizenship, that is a statutory condition for bringing a dissolution of marriage proceeding in this state. *Cf. Nicolas*, 444 So.2d at 1120 ("A person may, however, be a legal resident of Florida within the meaning of [Florida's dissolution of marriage residence statute] without being an American citizen, as it is legal residence, not citizenship, which is made a statutory prerequisite for beginning a marriage dissolution action in this state.").

## IV. *Challenge to Court's Ruling Refusing to Decline Jurisdiction Based on Forum Non Conveniens Doctrine.*

For her fall-back position Fumi relies on the doctrine of forum non conveniens. In support of this position Fumi argues that Japan is the more convenient forum and is the nation with the most significant contacts to the marital status of the parties.

Fumi contends the district court should have declined jurisdiction for these reasons.

■ Forum non conveniens is a facet of venue. This doctrine presupposes at least two forums in which jurisdiction and venue are proper. Under the doctrine a court may decline to proceed with an action though venue and jurisdiction are proper. The doctrine is a self-imposed limit on jurisdictional power that can be used to avoid unfair, vexatious, oppressive actions in a forum away from the defendant's domicile. *Silversmith v. Kenosha Auto Transp.*, 301 N.W.2d 725, 726–27 (Iowa 1981). This self-imposition is a response "to the expanding bases of personal jurisdiction derived from long-arm statutes." *Id.* at 726; *see, e.g.,* Iowa Code § 617.3 (Iowa's long-arm statute); Iowa R.Civ.P. 56.1(n) ("If service cannot be made by any of the methods provided by this rule [personal service], any defendant may be served as provided by court order, consistent with due process."); Iowa R.Civ.P. 56.2 (alternate method of service requiring defendant to have minimum contact with this state).

■ The mere desire of a party for some other forum is not enough to sustain a dismissal on the grounds of forum non conveniens. Nor is a showing that the claim arose elsewhere enough. *Silversmith*, 301 N.W.2d at 727.

■ What the moving party must show is that the relative inconveniences are so unbalanced that jurisdiction should be declined on an equitable basis. *Id.* at 727. Factors that bear on this determination include the following: the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the possibility of view of the premises, if view would be appropriate to the action; the enforceability of the judgment if one is obtained; and all other practical problems that make trial of a case easy, expeditious, and inexpensive. All of these factors pertain to the private interest of the litigant. *Id.*

■ Factors of public interest are also considered. They include the adminis-

trative difficulties for courts, trial in the forum that is the home of the state law which governs the case, and the burden of jury duty imposed on citizens of a forum with no relation to the litigation. Residency of the plaintiff is also considered but only as one of the many factors in the balancing process. *Id.* at 727–28.

■ Whether to apply the doctrine of forum non conveniens lies in the sound discretion of the district court. *Id.* at 728. And we accord considerable deference to a district court's ruling in such cases. *Id.* at 729.

In deciding whether the district court abused its discretion in this case, we think it would be helpful to look at the divorce process in Japan. Japan has a variety of ways to dissolve a marriage. Bryant, *Marital Dissolution in Japan: Legal Obstacles and Their Impact*, 17:00 Law in Japan 73, 74 (1984) [hereinafter *Marital Dissolution in Japan*].

In case of contested issues there are three ways to secure a divorce in Japan: divorce through mediation in the family court, divorce by judicial decree in the family court, and divorce by judicial decree in the district court. *Id.* A person seeking a divorce by judicial decree in the district court must prove fault. Fault includes:

adultery, desertion, absence of the spouse for more than three years without any contact or knowledge of his or her whereabouts, incurable mental illness, or grave cause that make continuation of the marriage difficult.

*Id.* The court requires vigorous proof of these grounds. And even if such grounds are shown, the court has discretion to refuse a divorce. *Id.*

The family court may grant a divorce without proof of such grounds. But a divorce by judicial decree in the family court is rare because if either party objects, the divorce becomes invalid. *Id.* So a decree of divorce by judicial decision usually issues from the district court.

Before the parties may proceed to the district court they must attempt mediation in the family court. *Id.* at 78. Divorce can be effected without resort to litigation if the parties can agree on terms. *Id.* If the

parties fail to reach agreement, a divorce petition may then be submitted to and processed by the district court. Mediators in family court have no power to arbitrate disputes and are likely to oppose the idea of divorce. *Id.* at 79. As a practical matter, a failure to agree to terms in mediation may mean no divorce in district court. *Id.*

A divorce in Japan means the severance of all ties between the parties—they virtually become strangers. *Id.* at 86. Usually a lump sum property settlement occurs. Because of enforcement problems, a settlement involving installment payments is rare. *Id.* at 86–87.

Alimony and other postdivorce maintenance payments are not available under Japanese law. *Id.* at 88. Indeed, there is no legal requirement that property be divided or that support be paid. *Id.* at 81 (in 1982 there was no monetary award in sixty-four percent of divorce cases handled in district court). Usually in family court mediation issues of child custody and child support are generally just touched upon and many times ignored if not raised by the parties. *Id.* at 88–89. Generally, there is no serious court enforcement of visitation and support. *Id.* at 90–91.

It has been suggested that divorce in Japan is quick and easy if a party can bribe, coerce, threaten, or persuade the other party to a divorce by mutual consent. *Id.* at 94. A nonconsensual divorce is difficult, if not impossible, to obtain. *Id.*

For many, the central problem is enforcement of the settlement agreement. *Id.* at 95. Although Japan has postdivorce mediation regarding financial maintenance, child support, custody, and visitation, once a divorce occurs a certain amount of bargaining power is lost. *Id.*

For several reasons, the district court here could have determined that Japan is the more convenient forum for the parties. First, Japan has complete jurisdiction over the marital status of the parties and over all the incidents of the marriage. Second, a Japanese court has a societal interest in the marital status of its citizens. Third, given the nature of the divorce proceedings in Japan, Fumi's bargaining power in a family court mediation may be reduced by permitting a dissolution of marriage here.

Fourth, Fumi may be at a cultural disadvantage with regard to customs and language in an Iowa proceeding. Last, Iowa is an inconvenient forum in relation to her residence.

On the other hand we think the district court was well within its discretion to deny Fumi's request to decline jurisdiction. Iowa too has an interest in the marital status of its residents. Right or wrong, our legislature has opted for no-fault divorce. One reason, we suspect, was to eliminate the extortion leverage an "innocent" spouse had over a "guilty" spouse. Had the district court honored Fumi's request, Ken—an Iowa resident—would have been denied the protection of Iowa's dissolution law. In short, a ruling in Fumi's favor may have resulted in no dissolution at all for one of this States' residents.

In addition we are impressed with the vigorous representation Fumi enjoyed in the district court and here. We doubt there would be any less representation in a post-dissolution action for alimony and property division. Such an action is possible here. *See Brown v. Brown,* 269 N.W.2d at 822. But as we noted earlier, such an action is not possible in Japan even though the divorce occurs there.

Our liberal discovery rules should allow Fumi to discover all of Ken's assets and his income in such an action. This is in contrast to Japan where it is difficult to discover a party's assets in divorce proceedings. *Marital Dissolution in Japan,* 17:00 Law in Japan at 82. Given our liberal rules on alimony and property division, we suspect Fumi might even fare better here than in Japan. *See id.* at 86–94 (suggesting that without overwhelming evidence of fault, awards of support are low if there is any award at all). Fumi can expect vigorous enforcement of any alimony or property division award here, something she could not expect in Japan.

For all these reasons we cannot say that the relative inconveniences are so unbalanced that the district court abused its discretion when it refused to decline jurisdiction.

V. *Disposition.*

The district court did not violate Fumi's rights under either the federal or state constitutions when it dissolved the marriage even though the court had no personal jurisdiction over her.

There was substantial evidence to support the pretrial ruling on the issue whether Ken met the residency requirements of Iowa Code section 598.6. Likewise, our de novo review of the record at the final hearing convinces us that Ken established those requirements.

The district court did not abuse its discretion in denying Fumi's request to decline jurisdiction based on the doctrine of forum non conveniens.

We affirm the district court's ruling on the preanswer motion challenging jurisdiction and the judgment dissolving the marriage.

AFFIRMED.