# IN THE COURT OF APPEALS OF IOWA

No. 16-1620
Filed June 7, 2017

IN RE THE MARRIAGE OF AMANDA ABD EL KRIM
AND MOHAMED KHALIL AMIN

Upon the Petition of
AMANDA ABD EL KRIM,
        Petitioner-Appellee,

And Concerning
MOHAMED KHALIL AMIN,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Story County, John J. Haney, Dale

E. Ruigh, and James A. McGlynn, Judges.


        An Egyptian father contests the Iowa court's jurisdiction over the

dissolution of his marriage and related custody and property issues.  **AFFIRMED**

**AS MODIFIED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Kathryn E. Davis, Cedar Rapids, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

In this divorce appeal, we consider the arguments of an Egyptian citizen contesting the jurisdiction of the Iowa courts to consider his ex-wife's petition. Mohamed Khalil Amin challenges the decree dissolving his marriage to Amanda Abd El Krim, alleging the district court lacked subject matter jurisdiction under the residency requirement at Iowa Code section 598.5(1)(k) (2013) and the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), codified in Iowa Code chapter 598B. If we find jurisdiction, Mohamed asks us to modify the decree's provisions on the following issues: custody, visitation, child support, spousal support, and the property award. Finally, Mohamed seeks attorney fees and court costs.

On the threshold claims, we conclude the Iowa district court had jurisdiction to dissolve this marriage and decide the related custody and property issues. Accepting the strong credibility findings reached by the district court in the decree, we affirm the decree in all but one respect. We modify the decree's visitation provision to incorporate the more specific language used in the order on temporary matters—allowing only supervised visitation in Iowa. We decline Mohamed's request for fees and costs.

### I.     Facts and Prior Proceedings

In July 2009, Amanda and Mohamed were married in Alexandria, Egypt. The family moved temporarily to Dubai, United Arab Emirates, where Mohamed worked as a computer systems engineer. Amanda testified the parties were still citizens of Egypt while living in Dubai. Mohamed testified: "Dubai is not a permanent place for me to live. Just for job." They travelled to the United States

in the spring of 2010 and lived in Chicago when their son, A.M.A., was born in May 2010.[1]  A few weeks after his birth, they returned to Dubai.  Mohamed is a citizen of Egypt.  Amanda's parents are Egyptian, but she was born in New York and, therefore, has dual citizenship.  Because A.M.A was born in the United States, he also has dual American and Egyptian citizenship.

Amanda and Mohamed separated in October 2011 while living in Dubai. Amanda returned with A.M.A. to Egypt for three months before moving to Iowa in December 2011.  Amanda testified she resettled in the Midwest because Chicago was the only place she had lived in the United States: "I chose Iowa because it's the same culture but less expensive, family-oriented.  I can raise a kid here and also to go to school."  Mohamed testified Amanda came to Iowa because she was romantically involved with an old college classmate from Egypt who was obtaining a degree here.  In January 2012, Mohamed came to the United States.

Amanda and Mohamed are both well-educated.  Amanda, who was twenty-nine years old at the time of this dissolution action, received a bachelor of arts degree from the University of Alexandria.  She testified her Egyptian degree was not recognized in this country, so she enrolled in pre-med classes at Iowa State University.  Mohamed, who was thirty-nine years old, has an engineering degree and has worked in high-paying jobs in the computer industry.

According to Amanda's testimony, A.M.A. has been diagnosed on the autism spectrum and has experienced developmental delays.  At trial, Amanda attributed A.M.A.'s "birth defects" to physical abuse inflicted by Mohamed during

---

[1] Mohamed testified the couple came to United States for "purpose of delivery only."

her pregnancy. She has sought therapy and clinical services for A.M.A in Iowa, and those interventions have improved his ability to interact with others.

On September 16, 2013, Amanda filed a petition for separate maintenance, seeking sole custody of A.M.A., as well as child and spousal support. The petition alleged Mohamed resided in California. Mohamed was adamant the petition should not go forward in the Iowa courts. He filed at least six separate motions to dismiss. When the district court denied those motions, Mohamed asked for appellate review, which the supreme court repeatedly denied as interlocutory.

In one of his motions to dismiss, filed November 6, 2013, Mohamed alleged Amanda provided inaccurate information in her petition, specifically that no custody proceedings were pending in any other state. The motion alleged custody litigation was pending in the parties' home country of Egypt, and under Iowa Code section 598B.105, the Iowa district court was to treat a foreign country as if it were a state and apply the UCCJEA articles concerning jurisdiction. At a December 9, 2013 evidentiary hearing, Amanda testified she filed for "a divorce of hardship" through her mother acting as power of attorney in early 2012. But because the courts in Egypt were not functioning properly and she had not returned to that country since December 2011, she had dismissed that action.

On January 31, 2014, the district court denied the motion to dismiss, concluding,

> because A.M.A. has been residing with his mother in Iowa for more than the last year, Iowa is the child's "home state" for purposes of litigation over his custody. Iowa Code section 598B.102(7). Accordingly, Iowa has jurisdiction to make an initial custody determination regarding A.M.A. Iowa Code section 598B.201(1)(a).

No impediment to Iowa's jurisdiction exists under the circumstances described in Iowa Code section 598B.206.

On September 16, 2015, the district court issued an order on temporary matters. The order stated, due to Mohamed's "obstinate and obstructionist pleadings, appeals, and legal maneuvering," Amanda's 2014 "application for an order on temporary matters could not be heard until August 15, 2015." The court found Mohamed (1) "has worked in high-paying jobs in the computer industry in the United States and Egypt, but he claims he is unemployed at this time" and (2) "strongly believes his child should be with him and the custody and visitation issues should be addressed in Egypt since he is an Egyptian citizen." The court also stated:

> Mohamed's current whereabouts cannot be verified to the Court's satisfaction, Mohamed has had no contact with the child for at least two years and as long as three years, there is no showing that Mohamed has provided support of any kind in any amount for Amanda or for A.M.A., through his legal maneuvering Mohamed has avoided the imposition of a child support order for two years, and Mohamed is now a stranger to his child.

The court placed temporary legal custody and physical care with Amanda and ordered any visitation to be supervised. The court also ordered Mohamed to pay temporary child support of $114 per month.

On November 3, 2015, Amanda moved for leave to amend the petition, requesting to dissolve the marriage rather than to establish separate maintenance. The court granted her motion on November 4, 2015, and set the matter for a trial scheduling conference. Trial was set for May 4, 2016. On April 21, 2016, Mohamed filed another motion to dismiss and a motion to continue the trial. He alleged for the first time that the parties' marriage had been

"previously dissolved in Dubai in 2012." At a hearing on the motion to dismiss, Amanda testified she first learned of the Dubai divorce in 2015 when a friend did a record search in that country and sent her a copy. Mohamed asserted the Dubai divorce only terminated the parties' marital status and could not resolve child custody and support issues. In an order denying the motion to dismiss, the district court ruled:

> At most, the Dubai decree is a termination of the marriage status. It does not claim to determine child custody, visitation or support. It does not claim to determine spousal support, or property division. [Mohamed's] repeated assertions that the parties remained wife and husband for more than a year after the Dubai decree was entered casts serious doubt on whether that decree was actually a divorce as that term is understood in Iowa. Even if it was, the issues relating to the child remain and must be resolved.

The district court held a dissolution trial on August 10, 2016. Amanda appeared in person and testified she believed that Mohamed currently lived and worked in California. She also presented evidence Mohamed bought a house for $655,000 in San Jose, California, in September 2014. Mohamed appeared by telephone, claiming he currently lived in Egypt, was "not able to get employment," and was "struggling and hunting for opportunities." When asked whether he held title to the California house, Mohamed was evasive:

> I don't know if—it's my friend's house so I don't know all my liabilities on this house. I give it to him. I don't know—we already signed this in Dubai. He was overseas. I tell you I don't know. I work with agent. I'm not aware of the real estate. I'm not from U.S. I just make—provide the paper. I got permission on having to receive the loan for this home so I don't know.

On the question of custody, Mohamed testified he was not able to come to the United States to see A.M.A., so he "expect[ed] the child to be in Egypt." He

testified that he was living in Cairo at time of trial with a new wife and they were expecting a baby.

On September 8, 2016, the district court issued the dissolution decree. The court concluded Amanda met the residency requirements for obtaining an Iowa divorce. The district court did not find Mohamed to be credible, concluding he had been "caught in a web of lies." The court expressed grave skepticism concerning Mohamed's financial disclosures. The court first discussed Mohamed's California real estate deal:

> It is undisputed that Mohamed is the record title owner of a house located at [] Cropley Avenue, San Jose, California, as well as a related bank account used for mortgage payments or escrow payments. . . . Mohamed testified at trial that he left the United States at the end of 2013, that he purchased the house in California through a real estate agent, that his friend, Mr. Hussein, arranged everything, that he simply signed documents, that his friend supplied the entire down payment of $50,000—$55,000, that although the bank account is in his name, it is managed by Mr. Hussein, and the money in that account belongs to Mr. Hussein and that the house is the property of Mr. Hussein. Mohamed also testified that Mr. Hussein was a student, that Mohamed owed Mr. Hussein some amount of money and that he agreed to take title to the house in his name as a way of working off this debt. Mohamed's story is incredible, literally so, because it is unbelievable. . . . Something smells. Mohamed claimed he simply signed documents, but buying a house and getting a $600,000 mortgage are not such simple feats.

The district court was struck by the impossibility that Mohamed could earn as little as he reported and still borrow the money necessary to purchase the California real estate:

> What bank would loan $600,000 to someone who is unable to pay 114 American dollars a month? On October 10, 2014, just a few days after purchasing a home for $655,000, Mohamed filed an application to defer appeal filing fees with the Iowa Supreme Court. In paragraph 6 of the application he told the Iowa Supreme Court he was "financially exhausted" and in paragraph 14 he said he had

no ability to pay an additional court fee or legal counsel fee. On August 17, 2015, Mohamed filed his financial affidavit and under the heading of "real estate" he answered "none for the husband." No mention of the bank account connected with the mortgage was made on the financial affidavit. . . . The bottom line is Mohamed has lied under oath. If he told the truth to the bank, then necessarily it means he lied under oath to the Court about his income and resources. On the other hand, if the story he gave to the Court is true . . . then necessarily it means he perpetrated a fraud on the bank by providing false information under oath to obtain the mortgage. Perhaps he lied to both the bank and to the Court. The bedrock determination in this case is that Mohamed has perjured himself and he cannot be believed.

The court awarded Amanda sole legal custody and physical care of A.M.A. The court decided "Mohamed should have reasonable rights of visitation." The court also ordered Mohamed to pay child support of $114 per month. The court ordered spousal support of $1 per year until Amanda dies, remarries, or reaches age sixty-five. In addition, the court awarded Amanda "any dowry or similar payment made or owing by Mohamed," as well as "all right, title and interest which Mohamed or Amanda or the two of them jointly may have in the California home and related bank account."

Mohamed filed a notice of appeal and has briefed numerous issues. Amanda filed a waiver of her opportunity to respond by appellee's brief.

## II.  Scope and Standards of Review

Our review is de novo, even on the jurisdictional claims. *See In re Marriage of Kimura*, 471 N.W.2d 869, 877 (Iowa 1991); *see also In re Jorgensen*, 627 N.W.2d 550, 555 (Iowa 2001). In equity cases such as this one, we give weight to the district court's fact findings but are not bound by them. *See Kimura*, 471 N.W.2d at 877. We are especially deferential when the district court makes credibility determinations about the parties. *See In re Marriage of Gensley*, 777

N.W.2d 705, 713 (Iowa Ct. App. 2009); *see also In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998) ("We will not second-guess those credibility findings."). In addition, we give the district court considerable discretion in awarding spousal support and will disturb an award only if we find it inequitable. *See In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998).

### III.   Subject Matter Jurisdiction

### A.  One-Year Residency Requirement for Petitioner

Mohamed first claims the district court acted improperly by finding Amanda satisfied the "one-year, good-faith minimum residency requirement" for a petitioner filing for divorce from a spouse living outside of Iowa. *See Root v. Toney*, 841 N.W.2d 83, 92 (Iowa 2013). Iowa Code section 598.5(1)(k) provides:

> Except where the respondent is a resident of this state and is served by personal service, [a petition shall] state that the petitioner has been for the last year a resident of the state, specifying the county in which the petitioner has resided and the length of such residence in the state after deducting all absences from the state, and that the maintenance of the residence has been in good faith and not for the purpose of obtaining a dissolution of marriage only.

While Amanda lived in Iowa for more than one year at the time of filing her petition, Mohamed claims Amanda did not maintain her Iowa residence in good faith but, rather, for a "nefarious" purpose. He alleges Amanda relocated to Iowa to deny him access to their son; therefore, she did not fulfill the residency requirement under section 598.5(1)(k).

As an initial matter, Amanda's dual Egyptian-American citizenship does not bar her from asking an Iowa court to dissolve her marriage. *See Kimura*, 471 N.W.2d at 878. In *Kimura*, our supreme court rejected a residency challenge to a

dissolution action brought by a Japanese citizen, noting "nothing in the evidence to support" the wife's contention that her husband's residence here was "in bad faith and *only* for the purpose of obtaining a dissolution of marriage." *Id.* (acknowledging Iowa's "liberal dissolution marriage law as compared to Japan's" may have been "*one* reason" the husband moved to Iowa but concluding that fact was not sufficient to defeat a finding of residency).

When reviewing Amanda's motives for establishing a residence in our state, the district court found "her purpose and intent for residing in Iowa was to provide a suitable home for herself and her child and to attend school, and not just to obtain a dissolution of marriage." From our de novo review of the record, we reach the same result. The record does not support Mohamed's accusation that Amanda "absconded" to Iowa with A.M.A. Mohamed complained at trial that "because of Amanda's actions he cannot get permission to return to the United States in order to see his son." The district court did not believe that complaint nor Mohamed's testimony in general. We defer to those credibility findings. Amanda satisfied section 598.5(1)(k)'s residency requirements, and the district court had jurisdiction to hear and decide her petition.

**B. UCCJEA**

Mohamed next invokes the UCCJEA, Iowa chapter 598B, as an impediment to the district court's jurisdiction to rule on Amanda's petition.[2] He

---

[2] Mohamed's brief also cites the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–11, enacted by Congress to implement the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), Oct. 25, 1980, 19 I.L.M. 1501. The Hague Convention is a multinational treaty establishing legal rights and procedures for the prompt return of children who have been wrongfully removed from one signatory nation or wrongfully retained in another. *See* Hague Convention, art. 1, 19 I.L.M. at 1501. Egypt is not a signatory. *See* https://travel.state.gov/content/child

argues the district court should not have decided A.M.A.'s custody because Amanda commenced a child-custody proceeding in Egypt that was still pending when she filed her petition in Iowa. Amanda acknowledged at a December 9, 2013 hearing that she had filed for a "divorce of hardship" while she was in Egypt at the end of 2011; she described her request as asking for "mediation to fix this family," but she asserted Mohamed did not respond.[3] She testified, in the fall of 2013, she moved to dismiss the action in Egypt, reasoning "we are both living in another country so Egypt hasn't any jurisdiction to deal with the case there. So the case has been dismissed."

The UCCJEA provides "the exclusive jurisdictional basis for making a child custody determination by this state." *In re Guardianship of Deal-Burch*, 759 N.W.2d 341, 343–44 (Iowa Ct. App. 2008). The provisions of the UCCJEA generally apply to courts of foreign countries. *See* Iowa Code § 598B.105.

After a hearing on Mohamed's motion to dismiss citing the UCCJEA, the district court ruled that Iowa was A.M.A.'s "home state" for the purposes of litigating his custody. *See id.* § 598B.102(7) (defining "home state" as the state in which a child lived with a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding). The court decided it had jurisdiction to make the initial custody determination under section 598B.201(1)(a) (recognizing Iowa jurisdiction where Iowa is child's "home

abduction/en/country/hague-party-countries.html (last visited May 23, 2017). So even if Amanda's removal of A.M.A. could be considered wrongful, which the record does not support, in this circumstance, Mohamed has no rights under the Hague Convention. *See Taveras v. Taveras*, 397 F. Supp. 2d 908, 912 (S.D. Ohio 2005) (declaring it "well-settled law" that "there is no remedy" when a child is taken from a non-signatory country and retained in a signatory country (citation omitted)).

[3] The record also suggests that Amanda's mother, who lived in Egypt, may have acted as her attorney-in-fact in regard to that lawsuit during 2012.

state"). The court further found no impediment to its jurisdiction under the circumstances described in Iowa Code section 598B.206(1), the UCCJEA's provision governing simultaneous proceedings:

> Except as otherwise provided in section 598B.204 [on temporary emergency jurisdiction], a court of this state shall not exercise its jurisdiction under this article if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this chapter, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this state is a more convenient forum under section 598B.207.

On appeal, Mohamed concentrates on section 598B.206, contending "Iowa should have declined jurisdiction because of the already-pending custody action in Egypt and Amanda's unjustifiable conduct." He contends the district court should not have accepted Amanda's testimony that the action in Egypt had been dismissed. The district court carefully considered Mohamed's argument under the UCCJEA and decided "the Egyptian court did not enter any orders fixing custody of the parties' son in that case and that Amanda's Egyptian case was dismissed." The documentation provided by Mohamed appeared to involve different lawsuits that he filed in the Nasr City family court. The district court found "no proof" Amanda "ever filed an appearance or otherwise submitted to the jurisdiction of the Egyptian court in the proceedings he brought." In our de novo review, we agree that Mohamed's documents did not rebut Amanda's testimony that the action she filed had been dismissed. The district court properly determined it could exercise jurisdiction under the terms of section 598B.206(1).

Next, Mohamed argues the district court should have declined jurisdiction over Amanda's petition because Iowa was an inconvenient forum under Iowa

Code section 598B.207. He contends, because he faces restrictions on his travel to the United States, his witnesses were based in the Middle East, and his native language is Egyptian, the more convenient forum *for both parties* would have been Egypt.

When deciding if it is appropriate for a court of another state to exercise jurisdiction, an Iowa court must consider the following factors: (1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; (2) the length of time the child has resided outside this state; (3) the distance between Iowa and the court in the state that would assume jurisdiction; (4) the parties' relative financial circumstances; (5) any agreement between the parties as to which state should assume jurisdiction; (6) the nature and location of the evidence required to resolve the pending litigation, including the child's testimony; (7) the ability of the court of each state to decide the issue expeditiously and the court procedures necessary to present the evidence; and (8) the familiarity of the court of each state with the facts and issues in the pending litigation. *Id.* § 598B.207(2).

None of these factors support Mohamed's argument that Egypt would have been the more convenient forum. The case before us does not involve modification of a custody determination but is the original custody determination. *Contrast In re Marriage of Hocker*, 752 N.W.2d 447, 450 (Iowa Ct. App. 2008) (ruling location of children post-decree was relevant to determination of state jurisdiction for modification petition). A.M.A. moved to Iowa in December 2011 and remained in Iowa at the time of the dissolution trial. The Iowa courts have

become very familiar with the case through Mohamed's vigorous litigation of the jurisdictional issues. The Iowa courts were not an inconvenient forum.

## IV. Custody, Visitation, and Child Support

### A. Sole Legal Custody

The decree awarded sole legal custody to Amanda. On appeal, Mohamed argues the district court "failed to cite clear and convincing evidence, pursuant to the factors in Iowa Code section 598.41(3), that joint custody is unreasonable and not in the best interest of the child." *See* Iowa Code § 598.41(2)(b). He asserts Amanda removed the child "out of Egypt without Mohamed's consent." Thus, he contends, granting her sole legal custody constituted "rewarding the perpetrator for wrongdoing."[4]

Mohamed's argument misses the mark. Custody determinations are not about punishing or rewarding the parents. "In child custody cases, the first and governing consideration of the courts is the best interests of the child." Iowa R. App. P. 6.904(o). In considering whether to grant joint or sole legal custody, Iowa courts weigh a list of factors developed by the legislature; the following are pertinent here: (1) whether each parent would be a suitable custodian for the child, (2) whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents, (3) whether the parents can communicate with each other regarding the child's needs, (4) whether both parents have actively cared for the child before and since the separation, (5) whether each parent can support the other parent's relationship with the child, (6) whether one or both the parents agree or are

---

[4] Mohamed does not appeal the district court's grant of physical care to Amanda.

opposed to joint custody, (7) the geographic proximity of the parents, (8) whether the safety of the child or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation, and (9) whether a history of domestic abuse exists. *See* Iowa Code § 598.41(3).

Mohamed testified he has not seen his son since October 2011. Although he suggested in his testimony that Amanda denied him access to A.M.A. when he was working in the United States, the record shows Mohamed never requested visitation through the courts and never exercised the visitation allowed under the 2015 court order on temporary matters. Amanda has been the sole caregiver since moving with A.M.A. to Iowa in December 2011. Amanda has been addressing the child's special needs. She testified she would like A.M.A. to have a relationship with his father, but she was not sure how it would work because Mohamed "broke every single bridge between us."

As the district court expressed in the decree, Mohamed offered "no credible information" concerning his ability to provide for A.M.A.'s health, education, or welfare. *See id.* The court noted: "Even if Mohamed's story were to be believed, that means he is currently living in poverty in Egypt while that country is experiencing substantial turmoil. There is no evidence that Mohamed would have access to the resources [that] A.M.A. needs." In addition, Amanda credibly testified Mohamed was abusive to her during her pregnancy with A.M.A. Given this array of facts, we conclude it was in A.M.A.'s best interests for Amanda to be granted sole legal custody.

**B. Visitation**

After awarding physical care of the child to one parent, the district court is required by statute to allow the other parent visitation that assures the child "the opportunity for the maximum continuing physical and emotional contact with both parents." *Id.* § 598.41(1)(a); *see also Gensley*, 777 N.W.2d at 717. The district court determined Mohamed "should have reasonable rights of visitation" and required Amanda to "permit reasonable visitation between Mohamed and his child." But the decree allowed Amanda "to insist on necessary safeguards for the health, safety, and welfare of A.M.A. during visitations."

On appeal, Mohamed complains the decree was not specific enough about the time and place of visitation and placed too much discretion with Amanda. He also contends the decree should provide for the sharing of transportation costs.

We agree with Mohamed on one point—the decree could be more specific in regard to visitation. Accordingly, we modify the decree to incorporate the following directives, some of which were imposed by the order on temporary matters. If Mohamed wishes to begin exercising visitation, he shall direct his attorney to contact Amanda one month in advance to schedule a reasonable time for visitation with A.M.A. in Iowa. Any scheduled visits shall last no longer than four hours and shall occur no more frequently than twice per week. The visitation will need to be supervised by a person or agency approved by Amanda.[5] The

---

[5] Other jurisdictions have approved supervised visitation where the non-custodial parent is a citizen of a country that is not a signatory to the Hague Convention and poses a risk of abduction. *See, e.g.*, *Lee v. Lee*, 49 So. 3d 211, 215 (Ala. Civ. App. 2010); *Shady v. Shady*, 858 N.E.2d 128, 143 (Ind. Ct. App. 2006).

cost of the supervision for the visitation shall be paid in advance by Mohamed. Only Mohamed shall be permitted to participate in the visitation with A.M.A. We decline Mohamed's request that any transportation costs be shared by the parties.

### C. Child Support

The district court ordered Mohamed to pay child support for A.M.A. The court considered Mohamed's education and training as a computer network architect and his experience working in that field in Egypt, Dubai, and the United States. The court found it reasonable to impute Mohamed's income at the minimum wage in American dollars based on a forty-hour work week, "[e]ven with the exchange rates and differences in wage rates." Accordingly, the court set Mohamed's child support obligation at $114 per month, starting in September 2016 and continuing until A.M.A. turns eighteen or finishes high school, whichever occurs last. The court also contemplated Amanda might obtain more reliable information about Mohamed's current income, stating "that fact shall be considered a material change of circumstances justifying a recomputation of child support."

On appeal, Mohamed argues the district court must calculate his child support based on his actual income, allegedly the equivalent of $153.80 per month, "unless the court makes express findings" under Iowa Court Rule 9.11(4) "that using his actual income creates an injustice for either party or the child."

While it is true the district court did not make an explicit written determination that using Mohamed's actual income would create an injustice for Amanda or A.M.A., that finding is implicit in the decree. Moreover, we may make

such a finding upon our de novo review of the record. *See, e.g.*, *In re Marriage of Lindemier*, No. 14-1321, 2015 WL 2089702, at *6 (Iowa Ct. App. May 6, 2015). Deferring to the district court's finding that Mohamed was not credible in disclosing his earnings, we conclude it would impose a substantial injustice upon A.M.A. to use Mohamed's highly questionable, alleged actual income. Like the district court, we look to Mohamed's education and work history to determine that he is capable of earning the minimum wage in American dollars to support his son. We decline to modify the child support ordered in the decree.

### V.    Property Awards and Spousal Support

### A. California Real Estate

Iowa law requires courts to divide marital property "equitably between the parties," considering several factors. *See* Iowa Code § 598.21(5); *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005) (confirming equitable does not always mean equal).

Here, the decree awarded Amanda "all right, title and interest to any dowry or similar payment made or owing by Mohamed." The decree also addressed the house purchased by Mohamed in California and the related bank account used for mortgage or escrow payments; the district court observed:

> It is uncertain whether Amanda has a community property interest in the real estate owned in California. The Court FINDS that the only fair, equitable and feasible division of assets is to award all right, title and interest which Mohamed or Amanda or the two of them jointly may have in the California home and related bank account to Amanda to be hers solely.

Mohamed argues this property division was inequitable and he should receive the California property. Following on the heels of his deceptive testimony

at trial, Mohamed offers the following cagey appellate argument to show his entitlement to the real estate:

> [Mohamed] purchased the property in 2014, nearly three years after Amanda separated from him by leaving Egypt. She did not participate in the purchase, nor provide any money for it, and found out about it nearly by accident. If there was any equity in the property, Mohamed used his own funds, years after the parties' separation, to purchase it.

Mohamed gains nothing by exploiting his own failure to come forward with accurate information about his assets. As the district court indicated, its ruling on the property issue was "based in large measure on [Mohamed's] lack of credibility." Our court upheld a similar decision in *In re Marriage of Hanson*, reasoning:

> One of the parties is totally incredible and appears to be lying in order to secret assets from the court and the opposing party. Without the gift of divination, it is *impossible* for the trial court to accurately divide the parties' property in an equitable manner. Since it is apparent it was Kenneth's machinations and deviousness which created the very problem he complains of, he may not now assert the trial court's ruling is inequitable.

475 N.W.2d 660, 663 (Iowa Ct. App. 1991).

To the extent that the parties' evidence allowed, the district court considered the factors listed in Iowa Code section 598.21(5) in dividing the parties' marital property. Mohamed provides us with no authority in support of his request to modify the property award. We are not persuaded it was inequitable to award the California real estate and bank account to Amanda.

## B. Place-Holder Alimony Amount

Finally, Mohamed objects to the spousal-support provision in the decree. The district court ordered Mohamed to pay "$1 per year in traditional spousal support to Amanda until she dies, remarries or reaches the age of sixty-five." The court found Amanda was "in need of spousal support" but reasoned it could not "determine Mohamed's actual earnings." The court set out: "As with the child support order, if Amanda obtains information concerning Mohamed's actual earnings, that fact shall be a material change of circumstances justifying a modification in the amount of spousal support."

We conclude the spousal-support award was justified under the circumstances. *See In re Marriage of Horstmann*, 263 N.W.2d 885, 892 (Iowa 1978) (upholding token award of alimony where payor-spouse would have opportunity to seek limitations on the award if payee-spouse later sought modification).

## VI. Appellate Attorney Fees

Mohamed seeks an award of appellate attorney fees in the amount of $18,000. Such an award is a matter of discretion with our court. *See In re Marriage of Witherly*, 867 N.W.2d 856, 861 (Iowa Ct. App. 2015). Mohamed's request is based on the same assertions he advanced at trial that were found to be incredible by the district court. Moreover, Mohamed generally was unsuccessful on this appeal. Accordingly, we decline to award him appellate attorney fees. Costs of the appeal are assessed to Mohamed.

**AFFIRMED AS MODIFIED.**